<u>FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                          :        Chapter 7

In re:                                 :

                                          :        Case No. 09-35544 (CGM)

Jon Dogar-Marinesco and Manuela Mihailescu,   :

                                          :

                       Debtor.     :

                                          :
-------------------------------------------------------------X

**MEMORANDUM DECISION AND ORDER FINDING VIOLATIONS OF THE
DISCHARGE INJUNCTION AND AWARDING SANCTIONS**

<u>**A P P E A R A N C E S**</u>**:**

For the Debtors:
        JON DOGAR-MARINESCO, *Pro Se*
        MANUELA MIHAILESCU, *Pro Se*

For Duane Morris LLP:
        Duane Morris LLP
        1540 Broadway
        New York, NY 10036
        By:    WILLIAM C. HEUER, ESQ.

For Ocwen Loan Services:
        Hinshaw & Culbertson LLP
        800 Third Avenue, 13th Floor
        New York, NY 10022
        By:    SCHUYLER B. KRAUS, ESQ.

For RAS Boriskin:
        RAS Boriskin
        900 Merchants Concourse LL-13
        Westbury, NY 11590
        By:    MICHAEL SAMUELS, ESQ.
                JOSEPH BATTISTA, ESQ.

For OneWest Bank n/k/a CIT Bank:
        Logan Lovells
        875 Third Avenue
        New York, NY 10022
        By:    NICOLE E. SCHIAVO, ESQ.

For Wells Fargo Bank, NA as trustee for Lehman Mortgage Trust Mortgage Pass-Through
Certificates, Series 2007-1:
>Blank Rome
>The Chrysler Building
>405 Lexington Avenue
>New York, NY 10174
>By:    DIANA ENG, ESQ.

**CECELIA G. MORRIS**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Before the Court is Debtors' motion to enforce the discharge violation and for sanctions

against Wells Fargo, Ocwen, OneWest, RAS Boriskin, and Duane Morris ("Secured Creditors")

for violations of the discharge injunction.  As the Debtors have provided evidence that they have

been harassed by Secured Creditors for years (including by having to defend an illegal

foreclosure action against Debtors' property and by receiving dozens of collection letters), the

Court finds that the discharge has been violated by each creditor individually and awards

sanctions.

### Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. §

157(a) and the Standing Order of Reference signed by Chief Judge Loretta A. Preska dated

January 31, 2012.  This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) (matters

concerning the administration of the estate) & (I) (determinations as to the dischargeability of a

particular debt).

### Background

Debtors, Jon Dogar-Marinesco and Manuela Mihailescu, filed for bankruptcy relief under

chapter 7 with this Court on March 11, 2009 and received a discharge of all of their debts on

June 8, 2009.[1]  In their petition, Debtors listed two adjacent pieces of property that they owned

by tenancy by the entirety.  The property located at 5868 Route 209 and designated as Lot 39.2,

was subject to a note and mortgage held by IndyMac Bank (the "Mortgaged Property").  *See*

Mot. for Termination of the Automatic Stay, ECF No. 18, Ex. 3, p. 34 (listing legal description

of the property as 5868 Route 209 with lot number 39.2 in the mortgage between IndyMac and

the Debtors dated November 7, 2002).  IndyMac was listed in the petition and received notice of

the bankruptcy filing.  *See* Ntc. of Ch. 7 Bankr., ECF No. 8 (listing IndyMac as having been

served with the notice of the bankruptcy).  In the petition, the Debtors states their intention to

surrender the Mortgaged Property.  *See* Vol. Pet., Stmt of Intention, ECF No. 1.

On September 22, 2009, OneWest Bank FSB ("OneWest") moved for relief from the

automatic stay in order to foreclose on the Mortgaged Property.  *See* Mot. for Relief from Stay,

ECF No. 18.  That motion was not opposed by the Debtors and the Court entered an order

granting that motion on October 20, 2009.  *See* Order Granting Motion, ECF No. 21.  On January

13, 2010, OneWest commenced a foreclosure action against the Mortgaged Property ("2010

Foreclosure Action").  *See* Opp. ¶ 6, ECF No. 57.

As to the Debtor's other property, located at 5858 Route 209 and designated as Lot 39.1

(the "Non-Mortgaged Property"), the chapter 7 trustee sold that piece of property back to the

Debtors for $148,600.  *See* Order Authorizing Sale, ECF No. 35.   From this sale and the sale of

some of the Debtors' other assets, the chapter 7 trustee collected $304,069.14 and a dividend of

66.3% was provided to unsecured creditors. Trustee's Final Report at 13, ECF No. 44.  The

bankruptcy case was closed on October 4, 2011.

---

[1] Unless otherwise notes, all references to documents may be found on this Court's electronic docket under case number 09-35544.

On January 29, 2016, over six years after this Court granted permission for OneWest to move forward with its *in rem* remedies on the Mortgaged Property, Wells Fargo Bank N.A. ("Wells Fargo") commenced a second foreclosure action against the Mortgaged Property (2016 Foreclosure Action"). *See* Opp. ¶ 10. According to Ocwen, this second action was commenced because there was an error[2] with the 2010 Foreclosure Action and asked that prosecution of that action cease. Opp. ¶ 9.

The 2016 Foreclosure Action contained serious discharge violations. The complaint initiating the 2016 Foreclosure Action listed lot number 39.1, the lot number of the Non-Mortgaged Property, instead of 39.2, the lot number of the Mortgaged Property. *See* Motion to Reopen, Ex. 8 (2016 Foreclosure Action Complaint) at ¶ 13 ("Said Mortgages, as consolidated, secured the real property known as 5868 ROUTE 209, KERHONKSON, NEW YORK 12446 and by Section 76.2, Block 2, ***Lot 39.1*** . . . .") (emphasis added); Opp. ¶ 10. Wells Fargo also filed a notice of pendency against the Debtors' Non-Mortgaged Property. *See* Motion to Reopen, Ex. 9 (Ntc. of Pendency of Action) ("[T]he mortgaged premises affected by the said foreclosure action, were, at the time of commencement of said action, and at the time of the filing of this notice bounded and described as follows: See Schedule A — "Legal Description" annexed hereto and made a part hereof Said premises being known as 5868 ROUTE 209, KERHONKSON, NEW YORK 12446 and by Section 76.2, Block 2, ***Lot 39.1***.") (emphasis added).

In addition to listing the incorrect property in the complaint and notice of pendency, Wells Fargo also mailed "Notice to Tenants of Buildings in Foreclosure" to Debtors at their Non-Mortgaged Property's address, 58**5**8 Route 209, instead of to their Mortgaged Property's

---

[2] According to the opposition papers, Ocwen has come to believe that there was no error and the 2010 Foreclosure Action remains open. *See* Opp. ¶ 16.

address of 58**68** Route 209.  *See* Debtor's Resp., ECF No. 83 (docs.[3] 91, 92, & 93).

Additionally, Manuela Mihailescu was mailed a summons for the 2016 Foreclosure Action at her

Non-Mortgaged Property's address.  *See* Debtor's Resp., ECF No. 83 (doc. 95).  The summons

contains a notice stating in all caps "YOU ARE IN DANGER OF LOSING YOUR HOME" in a

foreclosure proceeding and does not provide an address for the property subject to the

foreclosure proceeding.  *Id.*

      Understandably concerned, the Debtors made numerous attempts to have Wells Fargo

and/or the state court correct these violations.   Debtors filed an answer containing affirmative

defenses and counterclaims to the 2016 Foreclosure Action.  In that answer, Debtors clearly

indicate that the 2016 Foreclosure Action was filed against the Non-Mortgaged Property and that

such action constituted a violation of their discharge order and injunction.  *See* Opp. ¶ 11, Ex. B,

ECF No. 57 (copy of the Debtors' answer filed as an exhibit to the Debtors' motion to reopen).

On March 1, 2016, the Debtors also filed an Order to Show Cause with the state court that

specifically stated the Second Foreclosure Action and notice of pendency listed the incorrect lot

number.  *See* Opp., Ex. 5 (stating that "Wells Fargo and RAS Boriskin are attempting to

foreclose on Lot 39.1, a property on which Defendants never granted a mortgage to any bank,

and have filed a Notice of Pendency against said lot without even serving Defendants said

Notice.").  Debtors sent letters by certified mail to Wells Fargo, Ocwen, and Wells Fargo's

attorney in the foreclosure action, RAS Boriskin.  *See* Debtor's Resp., ECF No. 83 (docs. 96, 97,

98, 99, 100, 105, & 106).

---

[3] Upon the Court's request, Debtors filed a copy of all letters sent to Debtors by the Secured Creditors since their bankruptcy filing.  The Debtors response, which can be found on the Court's electronic public docket at ECF No. 83, contains 126 letters each designated with a number by the Debtors and a corresponding table of contents.  For simplicity's sake, the Court will use the numbers provided by the Debtor when discussing documents contained in that response.  *See* Debtors' Resp. at 9-20 ("List of Documents").

None of these actions worked.  Seemingly missing the point entirely, the state court ruled that Debtors' discharge was not violated by the "*in rem*" 2016 Foreclosure Action against them without addressing the fact that the complaint and notice of pendency were seeking relief against the Non-Mortgaged Property, in which Wells Fargo had no valid security interest.  Motion to Reopen, Ex. 4 (state court decision).  Duane Morris, Wells Fargo's and Ocwen's legal counsel, wrote a letter to the Debtors advising them that they received the Debtors' letter regarding the discharge violation and advised them that their assertions were "incorrect" and that their discharge had not been violated.  *See* Debtor's Resp., ECF No. 83 (doc. 109(2)).  Duane Morris also sent the Debtors a copy of a letter from Ocwen advising that Ocwen had reviewed the Debtors' loan and bankruptcy information and that the discharge did not prevent them from foreclosing on their lien against the property.  *See id*. (doc. 116(3)).  Again, both letters miss the point.  Wells Fargo was not simply enforcing rights in property secured by its lien, the Mortgaged Property; it was enforcing rights in property ***not*** secured by its lien, the Non-Mortgaged Property.

On July 13, 2016, the Debtors filed a motion to reopen this chapter 7 case to enforce the discharge injunction and to seek damages against the mortgagee and/or its counsel for violating the discharge injunction.  Mot. Reopen, ECF No. 53.  In that motion, Debtors explained that Wells Fargo by and through its attorneys had caused a *lis pendens* to be placed on their Non-Mortgaged Property on account of a mortgage debt that had been discharged in their chapter 7 case.  The Debtors also alleged that the secured creditor, in its various forms throughout the years, and its attorneys had continuously sent the Debtors collection notices without regard to the discharge order.  The Debtors estimated that they had received 100 calls and notices for collection of the discharged debt in the past 5 years.  The Debtors attached some state court

documents and some of the collection letters to this motion.  Debtors served the motion on

Duane Morris LLP and RAS Boriskin, LLC, among others.  *See* Aff. Serv., ECF No. 54.

Wells Fargo, OneWest, Ocwen, and Duane Morris filed a single opposition to Debtors'

motion through their joint counsel, Duane Morris.  The Court held a hearing to consider the

motion August 9, 2016 at 9:30 am.  At that hearing, it became clear to the Court that there were

many different discharge violations being alleged by the Debtors ranging from phone calls and

letters to improper foreclosure on account of a discharged debt.   It also became clear that various

entities could be subject to joint and several liability on these violations.  As such, the Court

granted the Debtors motion to reopen and set a hearing to consider the alleged discharge

violations.   The Court also instructed Brett Messinger, the attorney who appeared on behalf of

Wells Fargo; OneWest; Ocwen; and Duane Morris, that each entity should be prepared to have

its own representative in court at the next hearing.  Aug. 9, 2016 Hrg. Tr. 15:9-13 ("You should

prepare to have a representative from each servicer that did something on those letters in this

courtroom. You will not be heard if you represent more than one entity in this action. Am I

clear?").  On August 11, 2016, the Court entered an order reopening the case "for purposes of

determining whether Wells Fargo; One West Bank; Ocwen Loan Servicing; RAS Boriskin, LLC;

and Duane Morris LLP violated the discharge injunction either individually or jointly."  *See*

Order Reopen, ECF No. 69.

On August 30, 2016, the Court held a hearing to consider the Debtors' alleged discharge

violations.  Aug. 30, 2016 Hrg. Tr., ECF No. 82.  At that hearing, Duane Morris, RAS Boriskin,

Wells Fargo, OneWest,[4] and Ocwen, appeared; each with its own counsel.  *Id.* at 4:2-11.  At that

hearing, counsel for Duane Morris informed the Court that the firm had withdrawn the notice of

pendency on the Debtors' Non-Mortgaged Property and was working on dismissing the 2016

---

[4] "[N]ow known as CIT Bank."  Aug. 30, 2016 Hrg. Tr. at 4:8-9.

Foreclosure Action. *See id.* at 9:1-7. Duane Morris did not have a stamped copy from Ulster County. *Id.* at 20:9-12. Having heard that the removal of the *lis pendens* had not been returned to Duane Morris and that the 2016 Foreclosure Action had not been dismissed, the Court adjourned the hearing again to October 27, 2016. *Id.* at 26:22 – 27:12; 41:20.

The Court also ordered Debtors to gather all of the collection letters that they had received from the secured creditor, its servicers, and its attorneys over the years. *Id.* at 28:16-18, 22-24. The Court ordered the Debtors to provide a copy of the letters to the secured creditors by September 13, 2016. *Id.* at 42:9-10. The Court went on to advise the secured creditors: "When you come back the next time, I expect the whole record to be cleaned up. I expect everything to be moving forward in such a way that all of us can understand what's happening. By then, you will also have all the records of how many times they were contacted and all of what went on, so you will have an idea of what actual damages will be in this case. Have you all checked on your records? Weren't you all supposed to check on all your records to get them to me today? Wasn't that one of the things I said?" *Id.* at 31:5-13. The Court advised that it would consider allowing additional legal briefing on the issues once it saw the letters that Debtors received from the secured creditors. *Id.* at 40:5-10. The Court also advised the creditors that they "need[ed] to be looking at [the letters]." *Id.* at 40:2, 9.

On September 13, 2016, the Debtors filed with the Court 126 letters, which they believed violated the discharge injunction; these documents were placed on the Court's public docket and available for review by the secured creditors. *See* Debtors' Resp., ECF 83. On September 22, 2016, Duane Morris filed a letter acknowledging receipt of the documents. Ltr. From Duane Morris to the Court, ECF No. 85. The Debtors' also filed a statement of their estimated costs

and expenses related to the discharge violations and the subsequent motions.  *See* Stmt. of

Estimated Costs, ECF No. 88.

On October 25, 2016, Duane Morris filed an affidavit containing the various filings that

his firm had filed in Ulster County and in the 2016 Foreclosure Action.  *See* Aff., ECF No. 86.

These documents included a cancellation of the notice of pendency and an order to discontinue

the 2016 Foreclosure Action without prejudice.  *See id.*, Exs. A (cancellation of notice of

pendency), E (order discontinuing action).  The Court notes that the affirmation to cancel notice

of pendency, filed by Duane Morris, contains an additional discharge violation.  Paragraph 4 of

that document states: "An order was issued on June 6, 2016 directing that the present action be

discontinued and the action under Index. 0250/2010 proceed as the sole action for the relief

sought."  It goes on to state that the order is attached as exhibit A to the affirmation.  As will be

discussed in more detail below, the June 6, 2016 decision and order violated the discharge

injunction and is void *ab initio*.  As such, the reference to this decision in the affirmation must

also be struck.

On October 27, 2016, the Court held a hearing to consider the discharge violations and

damages.  At that hearing, the Court advised that this decision and order would be issued.[5]

**<u>Discussion</u>**

The fundamental purpose of bankruptcy law is to provide a "fresh start" to the "honest

but unfortunate debtor."  *Marrama v. Citizens Bank*, 549 U.S. 365, 367 (2007); *Conhen v. de la

Cruz*, 523 U.S. 213, 218 (1998).  To that end, the discharge injunction is essential to ensuring

---

[5] On November 21, 2016, the Court received a letter from the Secured Creditors asking permission of the Court to
have an additional 30 days to respond to the Debtors' supplemental papers, which were filed on September 13, 2016.
The Court notes that the Secured Creditors' letter requesting such relief was filed over 60 days after that document
was filed with the Court and served on the Secured Creditors and almost a month after this Court held a hearing to
consider the documents in question.  The Secured Creditors' letter was also filed almost 4 months since the Debtors
motion to reopen was filed.  It is unclear to the Court why the Secured Creditors would need 30 additional days to
respond to letters that they themselves sent.

that those debtors "enjoy 'a new opportunity in life with a clear field for future effort,

unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner*, 498

U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

To ensure a debtor receives a fresh start, the Bankruptcy Code provides for some

extraordinary remedies.  Upon receiving a discharge under chapter 7 of the Bankruptcy Code, a

debtor is discharged of all personal liability on prepetition debts.  11 U.S.C. §§ 524; 727(b); *see

also Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992) ("The discharge of a debt pursuant to § 727

triggers the operation of § 524, which protects the debtor from any personal liability on the

debt.").  Thus, any judgment determining a debtor's personal liability on a discharged debt is

automatically void no matter when it is obtained.  11 U.S.C. § 524(a)(1).   No actions may be

commenced or continued against the debtor and no process may be employed against him to

determine his personal liability on a discharged debt.  11 U.S.C. § 524(a)(2).  No act to collect,

recover, or offset any discharged debt may be brought as to the personal liability of the debtor.

11 U.S.C.§ 524(a)(2).   Section 524 also protects after-acquired community property from

collection in situations where only one spouse received a discharge.  11 U.S.C. § 524(a)(3).

## I.    Discharge Violations

As the Debtors have alleged hundreds of discharge violations against five different

parties, the Court believes it is necessary to discuss each violation separately to show that the

violator had knowledge and willfulness for each action.  As such, the Court will address the most

egregious actions first, namely the 2016 Foreclosure Action and its various summonses and

filings.  It will then address the letters that Debtors allege to be collection letters and the

registering of the Debtors' mortgage debt on the credit report.

### A.  2016 Foreclosure Action

As the Court has already stated in the case background, there are glaring violations of the discharge injunction that occurred within the 2016 Foreclosure Action having to do with the Non-Mortgaged Property.  There is no dispute that an *in rem* foreclosure proceeding against the Mortgaged Property that does not seek a judgment against the debtors personally does not violate the discharge injunction.  That is not what occurred in this case.  Here, Wells Fargo, through its attorney, RAS Boriskin, filed a complaint against the debtors that purported to foreclose on the Mortgaged Property but contained language that went beyond a normal *in rem* procedure.  This complaint alleged that Wells Fargo was entitled to foreclose on the Non-Mortgaged Property, property which Wells Fargo was never granted a mortgage lien.  Paragraph 13 of the complaint states that Wells Fargo's mortgage "secured the real property known . . .  by Section 76.2, Block 2, Lot 39.1 together with all fixtures and articles of personal property annexed to, installed in, or used in connection with the mortgaged premises . . . ."  *See* Complaint ¶ 13.  The next paragraph goes on to state that Plaintiff is the owner of a note and mortgage that permits it to foreclose on that property (¶ 14).  This is not the case. Wells Fargo did not have any legal right to take action against the Non-Mortgaged Property and its allegation that it was entitled to foreclose on Lot 39.1 violated the discharge injunction.

In the complaint, Plaintiff makes several other inaccurate statements: that "the balance of the principal indebtedness [is] immediately due and payable" (¶ 18);  and that "[t]he obligors may be adjudged to pay any deficient which may remain after applying all of said monies so applicable thereto unless the obligors were discharged in bankruyptcy" (Wherefore ¶ G). Notably missing from the complaint is the fact that Debtors did indeed file bankruptcy and that the underlying mortgage debt was discharged and the Debtors were no longer personally liable

on the note; thus, there is no "balance due" and no deficiency may be adjudicated against them. The complaint is signed by Anthony Cellucci of RAS Boriskin as attorney for Wells Fargo and he certified that both he and a representative of the Plaintiff reviewed the documents and records relating to the case for factual accuracy. *See* Mot. Reopen, Ex. 8 (Cert. of Merit attached to 2016 Foreclosure Action complaint). The complaint is neither factually nor legally accurate.

In addition to the incorrect lot number being used in the complaint, the incorrect lot number was also used on the notice of pendency. *See* Mtn. to Reopen, Ex. 9 (Ntc. of Pendency of Action) ("[T]he mortgaged premises affected by the said foreclosure action, were, at the time of commencement of said action, and at the time of the filing of this notice bounded and described as follows: See Schedule A — "Legal Description" annexed hereto and made a part hereof Said premises being known as 5868 ROUTE 209, KERHONKSON, NEW YORK 12446 and by Section 76.2, Block 2, ***Lot 39.1***.") (emphasis added). Not only was the filing of the notice of pendency against the Non-Mortgaged property a violation of New York state law [*See* N.Y. C.P.L.R. 6501; *Diaz v. Paterson*, 547 F.3d 88, 90 (2d Cir. 2008) (Under New York law, "a plaintiff in an action 'in which the judgment demanded would affect the title to, or the possession, use or enjoyment of real property,' may file a notice of pendency with respect to the real property ***that is the subject of the action***.") (citations omitted) (emphasis added)], but it was also a violation of the discharge injunction. While a *lis pendens* does not of itself create an encumbrance upon the property, it does serve "as a notice of a claim made in respect to property which is the subject of a pending suit." *In re Kodo Properties, Inc*. 63 B.R. 588 (E.D.N.Y. 1986) (internal citation omitted). Thus, while the notice of pendency was filed with Ulster County, Debtors were not free to sell or otherwise encumber their Non-Mortgaged Property. *Mechs. Exch. Sav. Bank v. Chesterfield*, 34 A.D.2d 111, 113 (N.Y. App. Div. 1970) (3d Dep't) (The

purpose of a notice of pendency "is to carry out the public policy that a plaintiff's action shall not be defeated by an alienation of the property during the course of the lawsuit.").  As Wells Fargo had no secured right to foreclosure against the Non-Mortgaged Property, Wells Fargo's "employment of process" against that property could be nothing other than an attempt to collecty against the Debtors' personally—a violation of § 524(a)(2).  11 U.S.C. § 524(a)(2).

To make matters worse, Wells Fargo sent "Notice[s] to Tenants of Buildings in Foreclosure" to "any and all occupants" and "Old Brickhouse Antiques," the Debtors' business. These notices were sent to addressees not affiliated in any way with the note and mortgage and to at the address of the Non-Mortgaged Property.  *See* Debtors' Resp., ECF No. 83 (doc. 91) (sent by certified mail to "Old Brickhouse Antiques 5858 Route 209 Kerhonkson, NY 12446"); *id.* (doc. 92) (sent by regular mail to "Old Brickhouse Antiques 5858 Route 209 Kerhonkson, NY 12446); *id.* (doc. 93) (sent by regular mail to "Any and All Occupants 5858 Route 209 Kerhonkson, NY 12446).   These tenants, in fact, were not occupying buildings subject to foreclosure.  In actuality, the notices were mailed to the wrong address 5858 instead of 5868, the address of the property subject to foreclosure.  A clear violation of the discharge injunction.

Moreover, a summons for the action was sent to the Debtors at the Non-Mortgaged Property's address.  *See id.* (doc. 95) (sent by regular mail to "Manuela Mihailescu 5858 Route 209 . . . .").  And, most perplexingly, a summons was sent to "Old Brickhouse Antiques LLC S/H/A John Doe 1" at the Mortgaged Property of 5868 Route 209.  *See id.* (doc. 102).  It is not clear to the Court why the Debtors' business would be summoned to be part of this *in rem* proceeding considering that Old Brickhouse Antiques is not a party to the action and does not appear on the mortgage documents.  It also appears that Old Brickhouse Antiques is located on the Non-Mortgaged Property.

With all of these allusions to Debtors' Non-Mortgaged Property it is no wonder that

Debtors feared Wells Fargo was attempting to foreclose on property to which it was not entitled.

Creditors argue that the inclusion of the Non-Mortgaged Property in the 2016 Foreclosure

Action complaint and notice of pendency was simply a "mistake"—some type of scrivener's

error. And yet, that "error" went uncorrected for approximately 10 months despite repeated

notices from the Debtors that such action was unlawful. Additionally, it took two hearings in

front of this Court to "fix" what creditors admit was an error. As was discussed earlier, when a

creditor learns of a discharge violation, it has an affirmative duty to correct that violation.

Failure to do so permits the Court to infer a debt collection motive. *In re Jones*, 367 B.R. 564,

570 (Bankr. E.D. Va. 2007). The evidence here shows that Debtors sent certified mail to Ocwen,

Wells Fargo, and RAS Boriskin advising them of the "error" at least as early as February 22,

2016. Additionally, the Debtors filed an answer to the 2016 Foreclosure Action complaint on

February 29, 2016, in which they described the problem in great detail. On March 4, 2016, the

Debtors filed an Order to Show Cause in the 2010 Foreclosure Action, which explained the

problem quite clearly. By March 22, 2016, Duane Morris filed an answer to the Debtors'

counterclaims. Thus, all relevant parties had notice of the Debtors bankruptcy, discharge, and

the complained of violations by March 4, 2016.

This notice should have been enough for the creditor and its agents to file amended

complaints and notices of pendency without hesitation—and yet they did not. Instead of fixing

the problem, a problem they acknowledge needed fixing, the violators actively opposed the

Debtors attempts to have the error corrected. They sent letters telling Debtors advising them that

their claims had been investigated and that the discharge had not been violated. The Secured

Creditors changed attorneys mid-litigation without notice to the Debtors or the state court. They

filed opposition to the Debtors' Order to Show Cause and filed answers to the Debtors' counterclaims. Moreover, the Secured Creditors managed to convince the state court that the discharge had not been violated.

Through these actions, the violators conveyed to the Debtors that despite not being personally liable for the debt secured by the Mortgaged Property, they were in jeopardy of losing their home, the Non-Mortgaged Property, because the Debtors' had failed to make payments on their discharged debt. And even if the creditors never intended to take possession of that property or legally could never take possession of that property, the Debtors were subjected to the fear that they could because the violators had a *lis pendens* on the Non-Mortgaged Property and a state court order sanctifying the violations. Such actions are objectively coercive or coercive in effect, whether or not they were so intended by the creditors. *Curtis v. Salem Five Mortgage Co. (In re Curtis)*, 359 B.R. 256 (B.A.P. 1st Cir. 2007) ("[A] variety of somewhat passive acts are potentially violations of the discharge injunction if they are objectively coercive or coercive in effect.").

The 2016 Foreclosure Action and the accompanying notice of pendency violated the discharge injunction and are void *ab initio*. All five violators are liable for either the initial violations (Wells Fargo and RAS Boriskin) or for not subsequently correcting the problems upon learning of them (Wells Fargo, Ocwen, OneWest, and Duane Morris) and will be sanctioned accordingly.

**B. Letters**

In addition to the aforementioned violations of the discharge injunction, the Debtors have provided evidence of dozens of additional discharge violations in the form of collection letters. Secured Creditors argued in their opposition to the Debtors motion, that the sending of

notices after bankruptcy is excepted from the discharge injunction, pursuant to § 524(j).  *See*

Opp. ¶¶ 39-46.  Section 524(j) states: "Subsection (a)(2) does not operate as an injunction against

an act by a creditor that is the holder of a secured claim, if—(1)   such creditor retains a security

interest in real property that is the principal residence of the debtor; (2)   such act is in the

ordinary course of business between the creditor and the debtor; and (3)   such act is limited to

seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit

of *in rem* relief to enforce the lien."

For this section to apply, the property in question must be the Debtors' principal

residence, which it is not.  The Debtors moved out of this property in 2009 and have been

residing in the Non-Mortgaged Property.  Moreover, subsection (j) makes clear that the excepted

acts are "*limited to seeking or obtaining periodic payments associated with a valid security

interest in lieu of pursuit of* in rem *relief to enforce the lien*."  Here, the Secured Creditor had no

reason to send any statements or obtain any periodic payments in lieu of pursuing *in rem* relief.

As has already been established, the Debtors surrendered the Mortgaged Property in their

bankruptcy proceeding, OneWest was granted relief from stay to pursue its *in rem* rights, and

OneWest commenced a foreclosure action against the Mortgaged Property in 2010.  Thus,

nothing was done "in lieu" of a pursuing in rem relief.  Secured Creditors were not only actively

pursuing *in rem* relief but Debtors also actively assisted them in obtaining the relief by

surrendering their property, moving out of the property, and not opposing the motion for relief

from stay.  Debtors wanted OneWest to foreclose and still do.

Rather than pursue their *in rem* rights to conclusion after filing the 2010 Foreclosure

Action, as they were entitled to do, Creditors sent dozens of letters to Debtors over the course of

several years in a manner than can only be labelled as harassment. Clearly, this section does not apply to the circumstances at hand.

Secured Creditors next argue that even if § 524(j) does not apply, the letters still would not violate the discharge injunction because the notices were not designed to collect a debt as a personal liability of the debtor. Opp. ¶¶ 47-52. The Court disagrees with Secured Creditors' contention that the letters were not an attempt to coerce the Debtors into making a payment on a discharged debt.

The sending of collection letters after receiving notice of a debtor's discharge is a clear violation of the discharge injunction. *See In re Szenes*, 515 B.R. 1, 8 (Bankr. E.D.N.Y. 2014). A creditor may also be found to have violated the discharge injunction if it causes a subsequent servicer to send collection letters by failing to inform the new servicer of the bankruptcy. *See Gunter v. Kevin O'Brien & Assoc. (In re Gunter)*, 389 B.R. 67, 73 (Bankr. S.D. Ohio 2008) ("'[P]lausible deniability' does not appear in the body of case law regarding violations of the discharge injunction or the automatic stay. The concept, however, fits those situations in which a creditor, with knowledge of the discharge injunction, turns a discharged debt over to a third party (e.g., an assignee or collections agent) without informing the third party of the discharge. In such instances, courts have held the creditor liable for violating the discharge injunction on the grounds that the creditor knew the debt would be collected and therefore should have advised the third party of the discharge."). "Conversely, courts have held debt collectors liable for violating the discharge injunction where they cavalierly disregard evidence that the debt assigned or referred to it may have been discharged." *Id.*

Courts have also found violations of the discharge injunction where a creditor attempts to induce a voluntary payment from a debtor on a discharged debt. *In re Nassoko*, 405 B.R. 515,

524 (Bankr. S.D.N.Y. 2009). Generally, a discharge order does not prevent a debtor from making voluntary payments to a creditor on a discharged debt. 11 U.S.C. § 524(f) ("Nothing contained in subsection (c) or (d) of this section prevents a debtor from voluntarily repaying any debt."). However, where the actions of a creditor are found to have induced the debtor into making the payments, those payments are not considered voluntary. *In re Nassoko*, 405 B.R. 515 (Bankr. S.D.N.Y. 2009) (Judge Gropper) (holding that language stating that there is no demand for payment may still be a violation of the discharge injunction and such language does not immunize creditor from liability). Welcome letters may also be violations even where no money is requested. *Id.*

Here, the Debtors filed copies of all of the letters that they have received regarding their discharged mortgage debt. The Court finds that 35 of these letters are indisputably discharge violations as they plainly seek to collect a discharged debt:

1)  On December 4, 2009, Debtors received a letter from "IndyMac Mortgage Services, a division of OneWest Bank, FSB" ("OneWest") stating: "As of the date of this letter, you owe a balance of $436,775.28." (doc. 2)[6]. On the next page, there is a small paragraph where the text states in bold that "However, if your debt has been discharged pursuant to the Bankruptcy laws of the United States, this communication is intended solely for informational purposes." *Id.* at 2.

2)  On January 29, 2010, OneWest sent the Debtors an Escrow Account Disclosure Statement. That statement provides the Debtors with what is essentially a bill for the escrow being paid by the mortgage company. It gives Debtors the "new mortgage

---

[6] Documents cited to as "(doc.)" can be found in Debtors' Resp. at 9-20 ("List of Documents") and the attached exhibits. While the Court adopts the Debtors' numbering system for clarity, the Court did not rely on the Debtors' table of contents for any purpose other than organization. The Court read the exhibits and assessed each individually.

payment" of $5,359.53 and tells them that their anticipated "escrow balance" will be $21,217.73 by the end of February. Both the mortgage and the prepetition taxes were discharged. Collection of these monies from the Debtors personally (as opposed to against their property) amounts to a discharge violation. (doc. 4).

3) On March 17, 2011, OneWest sent Debtors a letter regarding forced-placed insurance, which stated: "You will be responsible for the cost of the lender-placed coverage for the period the coverage was in force. The cost for this coverage would be $4,687.00." (doc. 11).

4) On February 9, 2012, OneWest sent the Debtors another letter regarding their escrow account. This one states: "Your mortgage payment will be $8,017.86 as of April 2012." (doc. 21).

5) On February 15, 2012, the Debtors were sent a letter from OneWest regarding forced-placed insurance coverage on their home. The letter indicated the "annual charge" for the year was $4,687.00. (doc. 22).

6) On February 14, 2013, the Debtors were sent a letter from OneWest regarding forced-placed insurance coverage on their home. The letter indicated the "annual charge" for the year was $4,687.00. (doc. 30).

7) On October 16, 2013, Ocwen sent the Debtors a letter advising them that servicing of their loan would be transferred from IndyMac to Ocwen, effective November 1, 2013. The letter clearly states: "Please make all checks payable to Ocwen and send all payments due on or after 11/01/2013 to [Ocwen]." (doc. 32).

8) On October 25, 2013, OneWest sent the Debtors a letter that included a "Current Balance Due" of $308,000. (doc. 33).

9) On November 5, 2013, Ocwen sent Debtors a letter that states: "our records reflect that the current unpaid debt is" and the "Total Due" as $612,661.28.  (doc. 36).

10) On November 18, 2013, Ocwen sent the Debtors an "Account Statement" that provides the "Total Amount Due" is $288,261.78 and includes a payment coupon. (doc. 38).

11) On December 17, 2013, Ocwen sent the Debtors an "Account Statement" that provides the "Total Amount Due" is $296,278.64 and includes a payment coupon. (doc. 40).

12) On January 10, 2014, Ocwen sent the Debtors a letter advising them that the Mortgaged Property appeared to be vacant and that the Debtors needed to take "full responsibility" for the Mortgaged Property to prevent vandalism and damage to the property at their own expense. (doc. 41).  The Court notes that this letter was sent almost 5 years after the Debtors had surrendered the Mortgaged Property in their bankruptcy petition and OneWest received relief from the stay.

13) On February 8, 2014, Ocwen sent the Debtors a letter regarding their insurance coverage that states: "You must pay us for any period during which the insurance we buy is in effect but you do not have insurance."  (doc. 44).

14) On March 15, 2014, Ocwen sent the Debtors a letter regarding their insurance coverage that states: "You must pay us for any period during which the insurance we buy is in effect but you do not have insurance."  (doc. 47).

15) On April 19, 2014, Ocwen sent the Debtors a letter regarding their insurance coverage that states: "You must pay us for any period during which the insurance we buy is in effect but you do not have insurance."  (doc. 49).

16) On February 4, 2015, Ocwen sent the Debtors a letter regarding their insurance coverage that states: "You must pay us for any period during which the insurance we buy is in effect but you do not have insurance."  (doc. 60).

17) On March 6, 2015, Ocwen sent the Debtors a letter regarding their insurance coverage that states: "You must pay us for any period during which the insurance we buy is in effect but you do not have insurance."  (doc. 64).

*18)* On March 6, 2015, Ocwen sent the Debtors a letter that states that the Debtors are past due and that the "Total Amount Past Due" on the mortgage loan is $410,599.44. (doc. 65). Additionally, it tells Debtors where to mail payments. *Id.* This letter contains large notices advising the Debtors that "if" the Debtors have received a chapter 7 discharge the letter is not meant as an attempt to collect a debt against the Debtor's personally. *Id.*

19) On March 18, 2015, Ocwen sent the Debtors a letter that states in large bold font: "The mortgage loan payment is past due and the property may be referred to foreclosure."  (doc. 68).

20) On April 5, 2015, Ocwen sent the Debtors a letter regarding their insurance coverage that states: "You must pay us for any period during which the insurance we buy is in effect but you do not have insurance."  (doc. 69).

21) On April 27, 2016, Ocwen sent the Debtors a letter stating that their "escrow payment has changed" and provided "[y]our monthly payment, including the new escrow amount is provided below." (doc. 71).

22) On August 20, 2015, Ocwen sent the Debtors a letter stating: "The mortgage loan payment is past due and the property may be referred to foreclosure."  (doc. 80).

23) On December 3, 2015, RAS Boriskin sent the Debtors a letter in which the law firms disclaims that it is "acting *solely* as a debt collector and *not* in its capacity as a law firm" and goes on to state "[w]e are attempting to collect a debt." (doc. 90).

24) On February 17, 2016, Debtors received a summons from Wells Fargo addressed to Old Brickhouse Antiques at 5858 Route 209. (doc. 91). This summons also contained a notice that the building was subject to foreclosure.  This was sent to the wrong address—the Non-Mortgaged Property.

25) On February 17, 2016, Debtors received a summons from Wells Fargo addressed to Old Brickhouse Antiques at 5858 Route 209. (doc. 92). This summons also contained a notice that the building was subject to foreclosure.  This was sent to the wrong address—the Non-Mortgaged Property.

26) On February 17, 2016, Debtors received a notice from Wells Fargo addressed to "Any and All Occupants" at 5858 Route 209 that the building was subject to foreclosure. (doc. 93). This was sent to the wrong address—the Non-Mortgaged Property.

27) On February 17, 2016, Debtors received a summons from Wells Fargo addressed to Debtor at 5858 Route 209. (doc. 95). This was sent to the wrong address—the Non-Mortgaged Property.

28) On March 2, 2016, Debtors received a summons from Wells Fargo addressed to Old Brickhouse Antiques LLC at 5858 Route 209. (doc. 102). This was sent to the wrong address—the Non-Mortgaged Property.

29) On April 2, 2016, Ocwen sent Debtors a letter regarding forced-placed insurance that states: "We must be repaid for any period during which the insurance we buy is in effect . . . ." (doc. 114).

30) On May 4, 2016, Ocwen sent Debtors a letter regarding forced-placed insurance that states: "We must be repaid for any period during which the insurance we buy is in effect . . . ." (doc. 117).

31) On June 3, 2016, Ocwen sent Debtors a letter regarding forced-placed insurance that states: "We must be repaid for any period during which the insurance we buy is in effect . . . ." (doc. 118).

32) On June 7, 2016, Ocwen sent the Debtors an account history that contained a payment coupon for Debtors to mail in their escrow shortage of $10,255.41.  (doc. 119).

33) On June 27, 2016, Ocwen sent the Debtors a mortgage account statement showing an amount due of $715,766.62.  (doc. 120).

34) On July 18, 2016, the Ocwen sent the Debtors a "mortgage account statement" with an amount due of $719,868.65. (doc. 126).

35) On October 6, 2016, Ocwen sent the Debtors an account disclosure statement that contained a payment coupon asking the Debtors to pay and "escrow shortage payment of $9,571.73. D's Supplmt. Decl., ECF No. 87 (doc. 128).

In addition to these 35 letters, the Debtors received 17 letters from OneWest/Ocwen regarding mortgage modification options or mortgage assistance resources [docs. 1 (OneWest), 3 (OneWest), 7 (OneWest), 10 (OneWest), 12-14 (OneWest), 18 (OneWest), 19 (OneWest), 35 (Ocwen), 37 (Ocwen), 39 (Ocwen), 77-79 (Ocwen), 85 (Ocwen), 123 (Ocwen)] and 10 letters introducing the Debtors to their "contact manager" or "personal relationship manager" [docs. 23

(OneWest), 25 (OneWest), 26 (OneWest), 46 (Ocwen), 48 (Ocwen), 50-52 (Ocwen), 121
(Ocwen), 122 (Ocwen)].

"The discharge injunction is intended to further one of the primary purposes of the
Bankruptcy Code: giving the debtor an opportunity to make a financial fresh start, unburdened
by efforts to collect debts she no longer owes." *In re Haemmerle*, 529 B.R. 17, 26 (Bankr.
E.D.N.Y. 2015). The fact that some of these letters are "informational statement" does not save
them from being discharge violations. *Id.* ("The explicit statements in the voluminous phone
calls and letters demonstrate a conscious and deliberate effort by Wells Fargo to collect on the
Loan even after being informed of Debtor's bankruptcy and the Discharge Order."). Altogether,
Debtors received 63 letters. The letters continued after the Debtors' bankruptcy case was
reopened and this Court held several hearings on the issue. Taken together, these letters amount
to an attempt to collect a discharged debt. *Id.*

### C. Credit Report

The Debtors also submitted evidence that Ocwen listed the discharged mortgage debt as
an open debt on the Debtors' credit report. After the Debtor contacted Ocwen, it submitted a
request to report the loan as "Discharged through Bankruptcy Chapter 7." *See* (doc. 45).
Reporting a discharged debt on a credit report can be grounds for sanctions as a violation of the
discharge injunction if the creditor fails to update the credit report as a means of inducing the
Debtor to make a payment on the debt. *McKenzie-Gilyard v. HSBC Bank Nev. N.A. (In re
McKenzie-Gilyard)*, 388 B.R. 474 (Bankr. E.D.N.Y. 2007) ("[A] creditor's intentional failure to
update a credit report with the hope that this will lead the debtor to repay the debt may amount to
contempt of the discharge injunction."); *see also Puller v. Credit Collections USA, Inc. (In re
Puller)*, 2007 WL 1811209, at *7 (Bankr. N.D. W.Va. 2007).

In this instance, Ocwen corrected the issue after being alerted to the problem by the

Debtors.  While the Court acknowledges that Ocwen should never have listed the debt as an

active debt, the law does not support sanctioning Ocwen for this violation as the problem was

resolved quickly.  The Court is aware, however, that this is yet another frustrating issue that

Debtors have had to deal with on account of the Mortgaged Property.

### D.  Failure to Pay Property Taxes

Despite the fact that the secured creditor consistently charged Debtors for escrow and

sent escrow statements, the taxes on the Mortgaged Property were not timely paid on at least

three separate occasions.  *See* (docs. 6, 74, 81, 125, 127).   The most recent letter is dated

September 1, 2016, which is well after this Court reopened this case.  How the payment of these

taxes could be overlooked after so much attention was brought to this loan (and five separate law

firms got involved in this case) is unclear.  These letters were sent by Ulster County and not by

the secured creditor and there is no evidence that the secured creditor intentionally failed to make

these payments. Thus, no sanctions will be assessed for these failures.  The Court does note,

however, that such incidents are part of an overall lack of attentiveness by the creditors and their

attorneys as to the issues in this case.

### II.    This Court (Not the State Court) is the Proper Venue to Determine if the Discharge Injunction has Been Violated.

Section 1334(a) of Title 28 of the United States Code gives bankruptcy courts "original

and exclusive jurisdiction of all cases under title 11."  Bankruptcy courts also have "have

original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in

or related to a case under title 11." "[N]othing in that section vests the states with any jurisdiction

over a core bankruptcy proceeding, including 'motions to terminate, annul, or modify the

automatic stay'" *In re Gruntz*, 202 F.3d 1074, 1083 (9th Cir. 2000).

Assuming that the state courts have concurrent jurisdiction over stay violations, those judgments must bow to the plenary power vested in the federal courts over bankruptcy proceedings. *Id.* ("Indeed, that was precisely the issue in *Kalb* [*v. Feuerstein*, 308 U.S. 433, 438-39 (1940)], in which the state was proceeding within its jurisdictional powers as to the subject matter, but in derogation of the federal bankruptcy stay."); *In re Benalcazar*, 283 B.R. 514, 526 (Bankr. N.D. Ill. 2002) ("[S]tate court judgments entered in violation of an automatic stay in bankruptcy are void *ab initio* and subject to collateral attack, even if the state court has (erroneously) determined that the automatic stay does not apply to the proceeding in which the order is entered.").[7] "A Congressional grant of exclusive jurisdiction to the federal courts includes the implied power to protect that grant." *Gruntz*, 202 F.3d at 1083 (internal citations and quotations omitted).

Moreover, as explained by the court in *Pavelich*, "[t]he statutory voidness and statutory injunction created by § 524(a) operate to strip a state court of the subject matter jurisdiction to require a debtor to pay a discharged debt." *Pavelich v. McCormick, Barstow, Sheppard, Wayte & Carruth LLP (In re Pavelich)*, 229 B.R. 777, 782 (B.A.P. 9th 1999). As such, a bankruptcy court need not give full faith and credit to a state court judgement that is void under § 524. *Id.*

Thus, it does not matter whether the state court in this instance had concurrent jurisdiction to decide whether the 2016 Foreclosure Action violated the discharge or whether this court has exclusive jurisdiction over such determinations because in either case, the state court decision is void pursuant to § 524(a)(1). *See In re Cruz*, 254 B.R. 801, 812 (Bankr. S.D.N.Y. 2000) ("[Section] 524(a)(1) operates to void the state court judgment to the extent it construes

---

[7] "Given the similarities between §§ 362(a) and 524, the Court may consider case law under both statutory sections in deciding the present case. *In re Bell*, 2014 Bankr. LEXIS 4717 (Bankr. N.D.N.Y. Nov. 13, 2014) (citing *In re Fucilo*, 2002 Bankr. LEXIS 475, at *39 (Bankr. S.D.N.Y. Jan. 24, 2002) (noting that these sections are comparable in many respects because § 524 is the post-discharge analogue of § 362)." Opp. 17 n.1.

the bankruptcy discharge incorrectly.").  By making the determination that the discharge has not

been violated when in fact it has, means that the state court has violated the discharge injunction

and as such, that decision is void.  *See Pavelich*, 229 B.R. at 781 ("By federal statute, any

judgment of any court that does not honor the bankruptcy discharge is "void" to that extent.");

*see also In re Dabrowski*, 257 B.R. 394, 406-07 (Bankr. S.D.N.Y. 2001) (discharge order has

prospective effects and declares "void" any judgment that construes the discharge order

incorrectly).

As such, the state court's June 6, 2016 decision is void and has no legal effect.

III.    **Sanctions for Violating the Discharge Order**

While § 524 does not include an explicit enforcement mechanism, violations of the

discharge injunction are punishable by contempt.  *In re Nassoko*, 405 B.R. 515, 520 (Bankr.

E.D.N.Y. 2009) ("There is no serious question that a violation of the discharge . . . is punishable

by contempt."); *In re Cruz*, 254 B.R. 801, 816 (Bankr. S.D.N.Y. 2000) (same); *see also* 11

U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title. No provision of this title providing for the

raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte,

taking any action or making any determination necessary or appropriate to enforce or implement

court orders or rules, or to prevent an abuse of process.").  For a finding of contempt, the movant

must show, by clear and convincing evidence, that the violating party had knowledge of the

discharge order and failed to comply with it.  *Torres v. Chase Bank USA, N.A. (In re Torres)*,

367 B.R. 478, 490 (Bankr. S.D.N.Y. 2007) (internal quotations & citations omitted); I*n re

Haemmerle*, 529 B.R. 17, 25 (Bankr. S.D.N.Y. 2015) (imposing compensatory and punitive

damages against Wells Fargo for calling the debtor 137 times despite having knowledge of the debtor's bankruptcy and discharge).

Sanctions for violating the discharge may be imposed to coerce future compliance with the court's order and to compensate the debtor for any harm that resulted from the noncompliance. *See Haemmerle*, 529 B.R. at 26. Compensatory damages include "attorneys' fees; litigation costs; travel expenses; other actual losses, such as wages or business income; and possibly emotional distress damages." *Id.* In addition, punitive damages are also appropriate if the Court finds "some sort of nefarious or otherwise malevolent conduct" that demonstrates a "complete and utter disrespect for the bankruptcy laws." *In re Perviz*, 302 B.R. 357, 369 (Bankr. N.D. Ohio 2003) (holding that a creditor, who willfully violated the discharge injunction, could be held in contempt and ordered to pay $8,000 in punitive damages).

## A. Knowledge of the Bankruptcy and Discharge Order

In this case, it is clear that IndyMac, OneWest, Wells Fargo, Ocwen, RAS Boriskin, and Duane Morris all had actual knowledge of Debtors' bankruptcy case and discharge of the debt secured by the Mortgaged Property. What follows is a list of all of the times the Court or the Debtors provided notice of their filing or discharge order and/or times that the secured creditor or one of its agents acknowledged same:

1. IndyMac was listed on schedule D of the Debtors' voluntary petition. *See* Vol. Pet, Sched. D, ECF No. 1.

2. IndyMac sent notice of chapter 7 Bankruptcy Case from Bankruptcy Court. *See* Ntc. of Ch. 7 Bankr. at 3, ECF No. 8.

3. OneWest filed a motion in the Debtors' bankruptcy case seeking relief from the automatic stay. *See* Mot. for Relief from Stay, ECF No. 18. The Court held a hearing

to consider that motion on October 13, 2009 and an order granting One West relief

from the automatic stay and permitting OneWest to proceed with a foreclosure

against the Mortgaged Property was entered on October 20, 2009. *See* Order, ECF

No. 21.

4. IndyMac received notice of the Debtor's discharge on June 8, 2009. *See* Disch. of

Debtor, ECF No. 14; 17.   The notice sent to IndyMac specifically states: "The

discharge prohibits any attempt to collect from the debtor a debt that has been

discharged. For example, a creditor is not permitted to contact a debtor by mail,

phone, or otherwise, to file or continue a lawsuit, to attach wages or other property, or

to take any other action to collect a discharged debt from the debtor. . . . A creditor

who violates this order can be required to pay damages and attorney's fees to the

debtor." *Id.*

5. On January 15, 2014, Debtors faxed a letter to Ocwen advising that they do not reside

at the Mortgaged Property and advised that, in 2009, they had filed bankruptcy,

surrendered the property, and received a discharge of their debts.  The Debtors also

advised Ocwen of the fact that the discharge debt was appearing on their credit report

with a "balance" of $402,375.  *See* Debtors' Resp., ECF No. 83 (doc. 42).   On

February 10, 2014, Ocwen sent a letter in response to the Debtors' letter

acknowledging the Debtors' bankruptcy discharge.  In that letter, Ocwen states: "Our

records indicate that you … filed for Bankruptcy…, which was discharged . . . . We

have submitted a request to report the loan as 'Discharged through Bankruptcy

Chapter 7.'"  *See* Debtors' Resp., ECF No. 83 (doc. 45).

6.  On December 28, 2015, the Debtors sent a letter to Ocwen after receiving a debt collection letter form RAS Boriskin.  In this letter the Debtors against advised Ocwen of their chapter 7 discharge.  *See* Debtors' Resp., ECF No. 83 (doc. 88).

7.  On February 22, 2016, Debtors provided certified mail receipts indicating that they sent Ocwen and RAS Boriskin additional letters advising them of their 2009 bankruptcy filing.  These letters were sent in response to the summons the Debtors received in for the 2016 Foreclosure Action.  The letters clearly indicate that the Debtors believed that their discharge injunction had been violated. The letters also indicate that Debtors received phone calls regarding service of process as well as summons to addresses that are not associated with the Mortgaged Property. *See* Debtors' Resp., ECF No. 83 (docs. 96, 97, 98).  Ocwen acknowledged receipt of the Debtors' letters on March 1, 2016.  *See id.* (doc. 101) ("This letter was sent to acknowledge that we are in receipt of your request regarding the Foreclosure initiated through correspondence received from Jon Dogar-Marinesco.").  Ocwen sent a second letter to the Debtors dated March 3, 2016.  This letter was signed by an Ceilia Chettiar, Account Analyst, Consumer Ombudsman and advised the Debtors that the "recent inquiry regarding the above-referenced loan" would be reviewed.  *See id.* (doc. 103).  On April 1, 2016, Ocwen sent a letter to the Debtors (again from Cecilia Chettiar) advising them that they were continuing their investigation.  *See id.* (doc. 113).  On April 8, 2016, Ocwen's Research Department sent a letter to Debtors that they "were unable to provide . . . a complete and adequate response" to her complaints.  *See id.* (doc. 115).  Ocwen eventually responded through its attorney, Duane Morris, as is discussed in paragraph 13 below.

8.  On February 22, 2016, the Debtors sent similar certified letters to the process server,

Provest, LLC. *See id.* (doc. 99).

9.  On February 22, 2016, the Debtors also sent a certified letter to Wells Fargo advising

it that the address Wells Fargo was using on the summons was not connected to the

Mortgaged Property but instead was for the Non-Mortgaged Property.  The Debtors

advised Wells Fargo that this was illegal as well as a violation of the discharge order.

A copy of all of the letters the Debtors believe violated the discharge order were

attached.  *See* Debtors' Resp., ECF No. 83 (doc. 100).   On March 3, 2016, Wells

Fargo responded to the Debtors' letter.  Wells Fargo acknowledged receiving the

Debtors' correspondence dated February 22, 2016.  Wells Fargo advised that it was

"forwarding your letter to your servicer, Ocwen Loan Servicing and are requesting

that they subsequently review your letter and respond in a timely and correct manner

to your contention that foreclose was pursued wrongfully or incorrectly."  *See id.*

(doc. 104).

10. On February 29, 2016, Debtors filed an "Answer, Affirmative Defenses and

Counterclaim" in the 2016 Foreclosure Proceeding.  Opp., Ex. B, ECF No. 57(3).  In

that answer, the Debtors very clearly state that the complaint incorrectly identifies the

Non-Mortgaged Property as securing the mortgage debt.  *See id.* ¶ 4 ("Deny the

allegations set forth in §13 of the Complaint and specifically deny that the IndyMac

mortgages 'secured the real property known as 5868 Route 209, Kerhonkson, New

York 12446 and by Section 76.2, Block 2, Lot 39.1' Said mortgages secured only Lot

39.2."); *see also id.* ¶ 10 ("Deny that Plaintiff is entitled to judgment against

Defendants as requested in the Complaint, deny that the IndyMac mortgages are a

lien on Lot 39 .1, deny that the Plaintiff has a right to the "personal property" on Lot 39.1, deny that Lot 39.1 is the property mortgaged by Indy Mac and that Plaintiff is the legal assignee thereof."); *see also id.* ¶ 11 ("Deny that the IndyMac mortgages were recourse and that Defendants can be liable for any deficiency").  The Debtors also clearly lay out as their "Fifth Affirmative Defense" that: "Any action to collect the mortgage indebtedness is in violation of federal bankruptcy law and the discharge injunction set forth in 11 U.S. C. §524(a)(2). Defendants received a discharge of this debt on June 8, 2009. (A copy of the Discharge of Debtor order is annexed as Exhibit 1)."  And the Debtors "Sixth Affirmative Defense" states: "Plaintiff is attempting to foreclose the wrong property, i.e. Lot 39.1, ori which IndyMac never had a lien. The IndyMac mortgage secured only Lot 39.2, as set forth therein."  In their Counterclaim, the Debtors spend approximately 7 pages describing how OneWest, IndyMac, Wells Fargo, Ocwen, and RAS Boriskin have jointly and severally knowingly violated the discharge order.  The Debtors allegations in the counterclaim include, but are not limited to: reporting the debt as active on the Debtors' credit report; filing a *lis pendens* against the incorrect property; contacting the Debtors by phone and mail to collect debts; receiving statements, escrow analyses and various other letters from the creditor or its agents.  *See id.* at 3-11.

11. On March 4, 2016, Debtors filed an Order to Show Cause in the 2010 Foreclosure Action, of which OneWest was the Plaintiff.  The Order to Show Cause alleges that "Wells Fargo and RAS Boriskin are attempting to foreclose on Lot 39.1, a property on which Defendants never granted a mortgage to any bank and have filed a Notice of Pendency against said lot without even serving Defendants said Notice."  The Order

to Show cause contained an affidavit in support in which the Debtors clearly lay out

the fact that they filed bankruptcy; the 2016 Foreclosure Action lists the lot for the

Non-Mortgaged Property; and the numerous letters and phone calls that Debtors

allege were collection calls in violation of the stay.   The words "wrong property" and

"wrong lot" appear in bold typeface so that they are apparently even at a cursory

glance.  *See* Opp., Ex. 4, ECF no. 57.

12. On March 22, 2016, Duane Morris filed an answer to the Debtors' counterclaim

denying or not responding to all allegations that the Debtors' discharge was violated.

*See Debtors' Resp.*, ECF no. 83 (doc. 107). No corrective action was mentioned in

the document.

13. On March 28, 2016, Brett Messinger of Duane Morris sent a letter to the Debtors

acknowledging receipt of their February 22, 2016 letter and acknowledging the

Debtors' allegations that the foreclosure action violated their bankruptcy discharge.

Mr. Messinger writes: "Please be advised that your assertion is incorrect."  He goes

on to state: "[Y]our discharge does not in any way prevent the filing of a foreclosure

action ***concerning the property covered by the mortgage***, where our client is seeking

to exercise its rights against the property, as opposed to seeking judgment against you

personally."  *See* Debtors' Resp., ECF No. 83 (doc. 109) (emphasis added).   The

letter fails to address Debtors' contentions that the foreclosure is occurring against the

Non-Mortgaged Property; fails to address the summonses being mailed to the Non-

Mortgaged Property; and failed to address the Debtors complains of collection letters

and calls.

14. On April 12, 2016, Duane Morris sent Debtors a letter advising that they represent Wells Fargo and Ocwen. Attached to the letter was a response from Ocwen to Debtors' February 22, 2016 letters dated April 11, 2016. The letter acknowledges the Debtors' bankruptcy filing and discharge. Ocwen advises that it possesses a lien on the Debtors' Mortgaged Property and advised that it initiated a foreclosure proceeding through its attorney RAS Boriskin. The letter does not address the Debtors' concerns that the 2016 Foreclosure Action was proceeding against the Non-Mortgaged Property. Nor does it address Debtors' concerns that *lis pendens* was filed against the Non-Mortgaged Property. The letter also fails to address Debtors' complaints about the summonses being mailed to the Non-Mortgaged Property and their receiving various collection letters and calls.

15. On July 17, 2016, the Debtors filed the motion to reopen, which began the motion practice in this Court. As was stated in the background of this decision, the motion to reopen plainly stated the fact that the Debtors had a bankruptcy and discharge order; that the 2016 Foreclosure Action and *lis pendens* was filed against the Non-Mortgaged Property; that the summonsed were served at the Non-Mortgaged Property; that the Debtors received collection calls and letters, which they believed were harassing and in violation of the discharge injunction.

Thus, it is clear that OneWest, Wells Fargo, Ocwen, RAS Boriskin, and Duane Morris each had independent knowledge of the Debtors bankruptcy, discharge, and of the alleged violations.

## B. Willfulness

For a discharge violation to be willful, the Debtors must show that the activity complained of continued despite knowledge of the discharge injection. Here, there is no doubt

that it did. "It has been said that a party's behavior is willful if it has knowledge or notice of

sufficient facts to cause a reasonably prudent person to make additional inquiry to determine

whether a bankruptcy petition has been filed and such party fails to make such inquiry." *In re*

*Roush*, 88 B.R. 163, 164-65 (S.D. Ohio 1988) (internal quotation & citation omitted). No

evidence of ill will or malice is necessary to prove willfulness. *Id.* Simply by showing that a

creditor pursued a debtor for collection without justification for that action, willfulness is met.

*Id.*; *see also In re McKenzie-Gilyard*, 388 B.R. 474, 484 (Bankr. E.D.N.Y. 2007).

A willful violation of the discharge may also be found where a creditor is informed of

violations and makes no effort to correct them. "When notice of a bankruptcy filing is received,

the burden is on the creditor to take appropriate action, including filing a proof of claim,

discontinuing any efforts to collect a claim, and taking affirmative action to undo any action

which may have been taken without notice of the bankruptcy in violation of . . . the discharge

injunction." *Poole v. U.B. Vehicle Leasing, Inc. (In re Poole)*, 242 B.R. 104, 111 (N.D. Ga.

1999) (citing *Jove Engineering, Inc. v. I.R.S.*, 92 F.3d 1539, 1557 (11th Cir. 1996)); *see also In*

*re Jones*, 367 B.R. 564, 570 (Bankr. E.D. Va. 2007) ("[I]f a creditor, having been informed of

the problem, inexplicably fails to take corrective action, a debt collection motive may be

inferred.").

Sanctions are warranted in this case. These creditors and their attorneys cavalierly

violated the discharge injunction over the course of years. Indefensibly, after the Debtors alerted

the Secured Creditors to the egregious violations contained herein, the Secured Creditors insisted

that they had done nothing wrong. Instead of taking steps to correct the multitude of problems,

creditors and their attorneys wrote letters to the Debtors advising them that they had a right to

foreclose on the Non-Mortgaged Property and filed pleadings in state court containing that same

argument.  They even convinced the state court that no violation had occurred.  After the Debtors

filed a motion to reopen with this Court, the Secured Creditors continued to insist that they had

done nothing wrong.  There is evidence in this Court's record that the creditors and their

attorneys received notice of the Debtors' bankruptcy and discharge on at least 15 different

occasions and at times acknowledged same.  *See supra*.  Yet, time after time, creditors failed to

correct the violations.

### C.  Compensatory Damages

Debtors are entitled to compensatory and punitive damages for these discharge violations.

Debtors filed a document indicating that they have spent $1,142.39 in expenses defending

against the actions of Secured Creditors and a total of 1,074.50 hours.  Supp. Estimated Costs,

ECF No. 88.  While the Debtors are entitled to an award of their expenses, they are not entitled

to attorney's fees.  In *Kay v. Ehrler*, the Supreme Court held that a *pro se* litigant in a civil rights

action who is not a lawyer is not entitled to attorney's fees. 499 U.S. 432, 435 (1991); *see also*

*Hawkins v. 1115 Legal Service Care*, 163 F.3d 684, 694 (2d Cir. 1998).

On rare occasions, bankruptcy courts have awarded compensatory damages for emotional

distress caused by a willful violation of the automatic stay or discharge injunction.  *See U.S. v.*

*Flynn (In re Flynn)*, 185 B.R. 89 (S.D. Ga. 1995); *see also In re Carrigan*, 109 B.R. 167, 172-73

(Bankr. W.D.N.C. 1989) (awarding actual damages for emotional distress in the amount of

$1000 and punitive damages in the amount of $5000).  Medical testimony is not necessary to

support a claim for damages for emotional distress caused by the willful violation of the

discharge injunction where it is clear that the debtor suffered emotion al harm as a result of the

creditor's conduct [*Flynn*, 185 B.R. at 93] or where a creditors' conduct is "egregious" and "[t]he

natural consequence of [creditors'] conduct was to oppress, harass, and abuse the debtor"

[*Carrigan*, 109 B.R. at 171-72].

Here, the Debtors are entitled to compensatory damages for suffering emotional distress.

Any reasonable person would become anxious if their home was being foreclosed upon and

especially so if the Plaintiff in that action had no legal entitlement to the property. Debtors spent

at least 7 months battling the Secured Creditors in the 2016 Foreclosure Action in state court---

without reprieve. Even the state court held that there was no discharge violation when there very

clearly was. As such, this Court awards the Debtors $1000 per month for each month that they

were subjected to Secured Creditors attempts to foreclose upon the Non-Mortgaged Property—

from January 29, 2016 when the complaint was filed until August 11, 2016, when this Court

granted the motion to reopen. Debtors are awarded $1,142.39 in expenses and $7000 in

compensatory damages for emotional distress caused by Secured Creditors inexcusable attempts

to sidestep their flagrant discharge violations. The total amount of compensatory damages

awarded is $8,142.39. The Secured Creditors shall be jointly and severally liable for these

damages as each contributed to the problem, as is discussed herein.

### D. Punitive Damages

Debtors are also entitled to punitive damages for the 2016 Foreclosure Action and the

various collection letters sent by Secured Creditors. "[T]he purpose of punitive damage awards

is to punish the defendant and to deter him and others from similar conduct in the future."

*Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir.1992) (citing *Smith v. Wade*, 461 U.S. 30, 54

(1983)). "The cases in this area have not established a formulaic approach to determine how

much in punitive sanctions should be assessed; rather, courts are called upon to exercise their

discretion to determine what punitive sanction is appropriate and reasonable." *In re Haemmerle*,

529 B.R. 17, 30-31 (Bankr. E.D.N.Y. 2015).   In awarding these damages, the Court must "make certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Id.* (quoting *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21 (1991)).

As for the 2016 Foreclosure Action, Secured Creditors conduct is inexcusable.   Secured Creditors issued a complaint against the Non-Mortgaged Property—a property to which they they had no legal or equitable claim.   The Secured Creditors served the Debtors at the Non-Mortgaged Property.   The Secured Creditors continued with their 2016 Foreclosure Action even after they knew the Complaint and Notice of Pendency contained errors and did not make any attempt to correct the "errors."   The Secured Creditors mailed letters to Debtors advising them that their internal investigations shows that no violations had occurred.   Moreover, they actively fought against the Debtors' attempts to have the state court correct the injustice by opposing the Debtors motions and convincing the court that no violation had occurred.   The Court believes that the compensatory award should be doubled in this instance and that Secured Creditors should be jointly and severally liable for in the amount of $8,142.39.   It is clear that each of the Secured Creditors (including the law firms of RAS Boriskin and Duane Morris) was informed that discharge violations had occurred and each played a part in covering it up.   Hopefully, this sanction will deter such behavior in the future and secured creditors and their attorneys will comply with their duty to actively work to "un-do" any known violations as soon as possible.

As for the collection letters, courts have found that $500 per discharge violation is an appropriate amount for punitive damages, especially in cases like this where the violations were consistent and creditor had actual knowledge of the stay.   *In re Haemmerle*, 529 B.R. 17 (Bankr. E.D.N.Y. 2015) (Judge Trust) (awarding $500 per violation for a total of $69,500 in punitive)

(citing *In re Szenes*, 515 B.R. 1 (Bankr. E.D.N.Y. 2014) (Judge Scarcella)).  The Court finds this amount reasonable.  Thus, Debtors are awarded $31,000 in punitive damages for the letters that they received in violation of the stay—$500 for each of the 62 letters.  These damages shall be paid by the party who sent the letter, as follows:  OneWest n/k/a CIT Bank (formally known as IndyMac): $500 x 19 letters = $9500; Ocwen: $500 x 37 letters = $18,500; Wells Fargo: $500 x 5 letters = $2500; RAS Boriskin: $500 x 1 letter = $500.

Thus, the total amount of punitive damages awarded to the Debtors is $39,142.39.  This brings the total damages awarded (both compensatory and punitive) to $47,284.78.

In addition, the Secured Creditors may not continue with the 2016 Foreclosure Action and may only proceed against the Mortgaged Property through the 2010 Foreclosure Action.  No new causes of action may be brought in that action without permission of this Court and no new actions may be commenced against the Debtors on account of this discharged debt or any circumstance related to this debt without permission of this Court.  The Secured Creditors (including their attorneys) may not charge or collect any fees against the Debtors or the Mortgaged Property for work done in violation of the discharge injunction, including the entire 2016 Foreclosure Action, defending this action and any and all letters found to have violated the discharge injunction.  Any such charges already being sought in the 2010 Foreclosure Action are void.  If any charges are assessed or new actions brought in violation of this Memorandum Decision, the Secured Creditors will be subject to additional damages.

## Conclusion and Order Finding Discharge Violations and Awarding Damages

For the foregoing reasons, the Court finds that OneWest, Ocwen, Wells Fargo, RAS Boriskin and Duane Morris have violated the discharge injunction.  The decision of Judge Mott dated June 6, 2016, is void *ab initio* and is without legal effect.  The Debtors are awarded

compensatory damages in the amount of $8,142.39 and punitive damages in the amount of $39,142.39 for a total award of $47,284.78.  OneWest, Ocwen, Wells Fargo, RAS Boriskin and Duane Morris are jointly and severally liable for the compensatory damages in the amount of $8,142.39 and for $8,142.39 of the punitive damages.  As to the remaining amount of punitive damages, each Secured Creditor is responsible to pay to the Debtors $500 for each letter it sent, as provided herein.

The 2016 Foreclosure Action and the accompanying notice of pendency violated the discharge injunction and are void *ab initio*.  Secured Creditor is free to continue its 2010 Foreclosure Action against the Mortgaged Property but shall not add any additional causes of action nor begin any new suits against the Debtors without permission of this Court.  No fees of any kind may be assessed against the Debtors or the Mortgaged Property for any work related to these discharge violations.

The Secured Creditors shall pay the Debtors these damages within 21 days of the date of this Order and shall prove compliance of such by filing an affidavit on the docket and attaching the check or other evidence demonstrating the amount has been paid.  For every day after the 21 days that the damages are not paid, Secured Creditors shall pay to Debtors an additional $50 per day.

It is **SO ORDERED**.



Dated: December 1, 2016
      Poughkeepsie, New York

/s/ **Cecelia G. Morris**
_____
**Hon. Cecelia G. Morris**
**Chief U.S. Bankruptcy Judge**